IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VIATECH TECHNOLOGIES, INC.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>MICROSOFT CORPORATION,<br><br>　　　　　Defendant. | Civil Action No. 17-570-RGA |

**MEMORANDUM**

Before the court is Defendant's motion to strike (D.I. 151) a portion of Plaintiff's infringement arguments[1]: infringement under the doctrine of equivalents (DOE) with respect to "user accessible functions"; infringement under the DOE with respect to "system fingerprint information in the dynamic license database"; and theories of literal infringement for the "graphical user interface" ("GUI") limitation that rely on third party software and media server software. (D.I. 151 at 2). The matter has been briefed in letters (D.I. 151, 152, 155, 158, 161) related to a discovery dispute (D.I. 150), for which I conferred with the parties on January 13, 2021 (D.I. 157).

A.  **LEGAL STANDARDS**

Infringement contentions are considered "initial disclosures" under Federal Rule of Civil Procedure 26(a). *See* United States District Court for the District of Delaware, *Default Standard*

---

[1] Defendant also moved to strike Plaintiff's theory of infringement under the doctrine of equivalents with respect to "embedded file access control mechanism embedded in the digital content file" (D.I. 155 at 1–3). Plaintiff withdrew this theory in its supplemental response letter. (D.I. 158 at 1).

1

*for Discovery* § 4(c). The parties agreed, and the Court ordered, that the initial infringement contentions in this case, due January 21, 2020 (later postponed by agreement to February 11, 2020 (D.I. 90), would effectively be final infringement contentions; that is, they could only be amended upon a showing of good cause. (D.I.73, ¶ 4.b.(4)). Infringement contentions that are not timely disclosed under Rule 26(a) may be subject to exclusion under Rule 37(c)(1). *See Intellectual Ventures I LLC v. AT&T Mobility LLC*, 2017 WL 658469, at *1, *5–6 (D. Del. Feb. 14, 2017).

When determining whether a party's failure to disclose was justified or harmful, and deciding whether to strike potentially critical evidence, courts consider the following factors: (1) the importance of information withheld; (2) the prejudice or surprise to the party against whom the evidence is offered; (3) the likelihood of disruption of the trial; (4) the possibility of curing the prejudice; (5) the explanation for the failure to disclose; and (6) the presence of bad faith or willfulness in not disclosing the evidence ("the *Pennypack* factors"). *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977)). Exclusion of "critical evidence" is an "extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Meyers*, 559 F.2d at 905 (quoting *Dudley v. South Jersey Metal, Inc.*, 555 F.2d 96, 99 (3d Cir. 1977)) (internal quotations omitted). Determination of whether to exclude evidence is committed to the Court's discretion. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994).

**B. ANALYSIS**

*1. Doctrine of Equivalents (DOE) Theories*

Defendant argues that portions of Dr. Madisetti's expert report should be excluded because "after fact discovery closed and without seeking leave of Court," the report introduced "new DOE theories, asserting that … (2) the display of 'user accessible functions' is equivalent to the display of license information, and (3) storage in the 'dynamic license database' is equivalent to storage of licensing information outside the database." (D.I. 151 at 2) (citing D.I. 151, Exh. 6 at 5, 32, 47; Ex. 7 at 5, 30, 41). Defendant further asserts that Plaintiff "did not explain why it failed to seek amendment of its contentions during fact discovery, and did not provide any good cause for waiting until its opening expert report to amend its infringement contentions." (*Id.* at 2) (emphasis omitted). This failure to disclose is also not justified, Defendant argues, because Plaintiff "had sufficient information at the time of filing its Complaint to assert" its DOE infringement theories without "wait[ing] for [Defendant's] non-infringement contentions." (D.I. 155 at 4–5).

Plaintiff, on the other hand, argues that it did not have enough information to assert its DOE theories when it filed its Complaint or stated its infringement contentions, which justifies assertion of its DOE theories for the first time in an expert report on December 1, 2020. (D.I. 158 at 1–3; *see* D.I. 157 at 23:18-24:4). With respect to its DOE theory regarding "user accessible functions," Plaintiff asserts that Defendant nonspecifically points to the ancillary documentation for the Complaint to argue that Plaintiff should have been aware that PlayReady software does not have any user-facing components and therefore cannot have a graphical user interface (GUI) providing "user accessible functions." (D.I. 158 at 1). In fact, Plaintiff maintains, documents attached to the Complaint indicate that PlayReady code "does refer to the functions of

3

a user interface," such as reference to use of PlayReady to "play back protected content." (*Id.* at 1–2) (citing D.I. 37-1, Exh. C at 4). For the DOE theory with respect to the "system fingerprint information in the dynamic license database," Plaintiff argues that it identified "multiple types of system fingerprint information" not strictly limited to "domain" information, which provides sufficient basis to assert its DOE theory more broadly. (*Id.* at 2).

In its reply, Defendant disputes both claims. First, Defendant argues that because the "Developing PlayReady Clients" document made clear that "PlayReady is a mere under-the-hood toolkit," the only reasonable inference would be that "PlayReady does not provide the UI [user interface]." (D.I. 161 at 1). Second, Defendant maintains that all of Plaintiff's "system fingerprint information" claims were mapped to the "domain" charts, and, therefore, Dr. Madisetti's DOE theory based on a "PlayReady device certificate," which was not previously disclosed in the infringement contentions, is inapposite. (*Id.*) (citing D.I. 158, Exh. 10).

I agree with Defendant that portions of Dr. Madisetti's Expert Report violate the court's scheduling order by presenting new DOE infringement theories after the close of fact discovery on October 29, 2020 (D.I. 124 at 2), and well after the February 11, 2020, deadline for disclosure of infringement contentions based on core technical documents (D.I. 90 at 1). Amendments to infringement contentions required Plaintiff to show "good cause" (D.I. 73 at 2); introducing new DOE theories in its opening Expert Report without further explanation is not "good cause."

The *Pennypack* factors favor exclusion of the portions of Dr. Madisetti's report that relate to Plaintiff's untimely DOE theories. Although the portions of Dr. Madisetti's report introducing the new DOE theories have some importance, since they relate to Plaintiff's attempt to prove infringement of claim 1 of the '567 patent (D.I. 151, Exh. 6 at 19–32, 41, 47), they are not so important that any of Plaintiff's literal infringement theories are being discarded. (D.I. 157 at

25:22-26:7). Plaintiff does not need the DOE theories; it simply wants to advance new and additional theories. The injection of new theories into the case have prejudiced Defendant, which did not have the opportunity during the previously closed fact discovery to "take any discovery on the factual bases of these new theories" nor "develop[] its own factual record, for example, marshaling evidence of ensnarement or non-equivalence related to the new DOE theories." (D.I. 151 at 3). I also take into consideration that Plaintiff had not previously asserted any DOE theories for claim 1 of the '567 patent in its infringement contentions or during fact discovery. (*Id.* at 2). It might nevertheless be possible to mitigate prejudice to Defendant— perhaps by allowing Defendant additional fact and expert discovery—without disrupting the trial schedule since the trial is not until September 13, 2021. (D.I. 124 at 2). But I do not think it would do more than mitigate prejudice; Defendant developed its case based on its understanding of Plaintiff's theories—its invalidity theories might have been developed differently had Plaintiff's DOE theories been timely asserted.

      Plaintiff has not given a convincing explanation for its failure to timely disclose its new DOE infringement theories. Plaintiff argues that it was only able to collect evidence to support its new DOE theories upon completing examination of source code provided by Defendant, a process that was delayed to October-November 2020 due to COVID-related challenges. (D.I. 152 at 2).

      Furthermore, Plaintiff argues that, with respect to the DOE theory related to "dynamic license database," November 5, 2020 deposition testimony from Defendant's witness Sam Wenker supported a DOE theory that "storage of the hardware ID in a separate device certificate file is equivalent to storage in a 'dynamic license database.'" (*Id.* at 3) (citing *Id.*, Exh. H at 166:17–167:8). Because the importance of this evidence only came to light after Defendant's

5

non-infringement contention relating to this issue, and because the theories are only new with respect to "where the hardware ID is stored," (D.I. 158 at 4), Plaintiff argues it could not have raised the theory earlier (D.I. 152 at 3).

Defendant asserts, however, that this DOE theory is entirely new because every mapping presented in Plaintiff's infringement contentions for the system fingerprint in the "dynamic license database" related solely to the domain. (D.I. 161 at 2) (citing D.I. 151-2, 151-3). Plaintiff's presentation of a DOE theory for "dynamic license database" that relies on the "'PlayReady device certificate' discussed at the Wenker deposition" is therefore not a "new location of a previously described system ID" but rather a "new theory of infringement based on a 'PlayReady device certificate.'" (*Id.* at 2) (emphasis omitted).

I agree with Defendant. Plaintiff's infringement contentions related to "dynamic license database" do not mention the "PlayReady device certificate" asserted in its new DOE infringement theory. (D.I. 151-1, Exh. 1 at 4–8; D.I. 151-2; 151-3). Because all prior references to the "dynamic license database" refer specifically to the domain, introducing this DOE theory now would improperly introduce a new argument that goes beyond merely changing "where the hardware ID is stored."

With regards to the "user accessible functions" DOE theory, Plaintiff argues that it did not have sufficient basis for disclosing this theory in its infringement contentions (D.I. 158 at 1–2) but does not otherwise explain why it chose to introduce this theory *now* in its Expert Report. Plaintiff argues that a publication by Defendant, "Developing PlayReady Clients," states that a PlayReady client includes functions that intuitively require a GUI, such as functions that "play back protected content," so Plaintiff could not have reasonably inferred that the PlayReady

6

software did not display anything to the user through a GUI. (D.I. 158 at 2) (citing D.I. 37-1, Exh. C at 4).

Defendant, on the other hand, notes that while the document cited by Plaintiff states that a PlayReady *client* does have playback functionality, the client is developed by third parties and not Defendant. (D.I. 161 at 1). Any GUI elements, Defendant argues, are therefore attributable to third party UI development and not to the PlayReady code. (*Id.*).

I again agree with Defendant. The "Developing PlayReady Clients" document plainly indicates that PlayReady clients can include an "app, media application, or browser plug-in," all of which would be developed by a third party. (D.I. 37-1, Exh. C at 4). An app or media application could certainly have playback functionality that would require a GUI, but the document differentiates between the clients that make use of the PlayReady software and the PlayReady SDK (software development kit) itself as the base code for development of those clients by third parties. (*Id.*). There is sufficient basis to infer that PlayReady itself would not encode the GUI elements.

I therefore agree with Defendant that both of Plaintiff's new DOE theories should be excluded.

2. *Graphical User Interface* (*GUI*) *Literal Infringement Theory*

In its infringement contentions, Plaintiff asserts that the PlayReady client "includes a graphical user interface ('GUI') that is associated with the PlayReady client's license utility that provides communications between a user and the user accessible functions of the license functions mechanism." (D.I. 151, Exh. 4 at 32). More specifically, Plaintiff contends that PlayReady enables "programmatic access" to "rights information," such as "if the content can be played or copie[d], or whether the license has expired." (*Id.*). As an example, Plaintiff suggests

7

that "the PlayReady client GUI can display a variety of error messages to a user." (*Id.*). Based on its expert report, Plaintiff now argues that the GUI limitation is also met by third party software and media software that present a variety of "user accessible functions" apart from those that provide information about the content's license status. (D.I. 152 at 2) (citing D.I. 151, Exh. 6 at 19–32). Plaintiff contends, however, that the basis for this argument is apparent from the initial infringement contentions and, therefore, not improper to introduce at this stage of the litigation. (*Id.*).

Defendant, on the other hand, argues that Plaintiff's infringement contentions "relied solely on error messages provided by the PlayReady software" rather than, as Plaintiff asserts through Dr. Madisetti's Expert Report, error messages from PlayReady "to an application that may or may not then provide the codes to a user," which Plaintiff asserts as "equivalent to providing a 'user accessible function' via a GUI." (D.I. 161 at 1). Defendant suggests that Plaintiff's failure to make this argument explicitly in its infringement contentions shows that Plaintiff "knew it could not find 'user accessible functions' provided by a PlayReady GUI. (*Id.*).

I agree with Defendant. Plaintiff's infringement contentions refer specifically to GUI elements related to the PlayReady client's license utility. (D.I. 151, Exh. 4 at 32). The examples of GUIs provided in Dr. Madisetti's expert report, on the other hand, refer to a variety of third party application functionalities governing playback, purchase, and other actions related to PlayReady-protected media but not necessarily innate features of the PlayReady software itself. (*Id.*, Exh. 6 at 19–32). The GUIs presented in the Expert Report interface between the user and the third party application, not between the user and the PlayReady client in relation to "programmatic access to the rights information for a piece of content," as was asserted in the infringement contentions. It is reasonable to expect—especially in light of the discussion of the

8

relationship between PlayReady and its clients in the "Developing PlayReady Clients" document (D.I. 37-1, Exh. C at 4)—that Plaintiff had sufficient basis to put forth in its initial infringement contentions a theory that GUI elements of third party applications using the PlayReady software literally infringed the GUI limitation of claim 1 of the '567 patent. It is untimely to do so now, for essentially the same reasons under the *Pennypack* framework as discussed earlier with regards to the DOE theories.

### C. CONCLUSION

No court likes to say that a party acted in bad faith. That being said, I do not understand how Plaintiff's experienced lawyers could have thought that springing clearly new theories on a defendant in opening expert reports was in compliance with the scheduling order, the Rules, or expected standards of practice. While I do not find Plaintiff acted in bad faith, its actions approach that standard. Plaintiff's failure to convincingly explain its choice not to timely disclose its new DOE and literal infringement theories—especially since Plaintiff has always carried the burden of proving infringement—and the prejudice to Defendant since it cannot now engage in discovery related to these new theories, taken together, justify the exclusion of the portions of the Expert Report that opine on those theories.

Defendant's motion to strike (D.I. 151) is **GRANTED**.

/s/ Richard G. Andrews  
United States District Judge